Catron, Ch. J.
The first ground of defence relied on is, that the complainant is barred by the verdict and *158 judgment at law, having there made a full and fair de-
The bill alleges that Joseph Faris purchased the ne-groes of James Fulcher, at the price of five hundred dollars; and at or about the time of the purchase took possession of them, and continued it up to the time of the levy. But to hinder and delay the creditors of Joseph Faris, the bill of sale was made to John Faris, his father-in-law; that the complainant, as sheriff of Franklin county, levied on the slaves as the property of Joseph Faris, ignorant that John held the legal title; sold them to pay the debt of Robbins; was sued at law by John Faris, who recovered a judgment against complainant for four hundred dollars damages; that in the action of trover, John Faris availed himself of his legal title, and recovered on this ground, the court holding, that although Joseph might have paid the purchase money, yet the legal title, by the bill of sale, passed to John, and he was entitled to recover.
The evidence heard in the action at law, and the evidence in the record, independent of it, shew, Gray resisted the recovery on two grounds: first, that Joseph Faris bought the negroes from Fulcher; and second, that if John purchased them, he, shortly thereafter, sold them by parol to Joseph, who refunded him the five hundred dollars paid by John to Fulcher. On the first ground of defence, the circuit court charged the jury, on the authority of the case of Childs vs. Derrick, 1 Yerg. 79, that the legal title rested in John, by the bill of sale from Fulcher to him, notwithstanding Joseph had paid the purchase money; and notwithstanding the title was thus made to hinder the creditors of Joseph, still at law the plaintiff was entitled to recover. On the second point, the jury was charged, that if they believed Joseph had purchased the negroes from John, then he had a good title, by the contract and delivery of possession, and they should find for the defendant, Gray. The jury *159 found that Joseph did not purchase from John, and therefore a court of equity will not re-examine this ground of defence, by enforcing it on the injunction powers of the court, were it true. The complainant has not involved the cause with such an objection. The bill does not allege that Joseph purchased from John, ■but that the purchase was made from Fulcher by Joseph, with his own money, and the bill of sale and legal title made to John, to defraud the creditors of Joseph; and that for him John held the naked legal title as trustee. This is the issue presented by the bill and answer.
Had it been admitted by John, that Joseph did pay the purchase money for the negroes, and that the title was made to John to hinder and delay the creditors of Joseph, this would not have avoided the title made by James Fulcher. The statute of frauds, 1801, cb. 25, declares every conveyance void, if made with the intent to hinder and delay creditors: but creditors of whom? Of the grantor. He holds the legal title if the deed be void, and on the legal title alone can the execution attach. Fulcher’s bill of sale was valid, and passed title: as to Joseph Faris’ creditors, it matters not who paid the purchase money, or what were the intentions of John and Joseph Faris. It follows, Gray had no ground to stand on at law, or power to defend himself, and therefore is not barred by the verdict and judgment to pursue any equity that may be vested in him by substitution, by force of the recovery at law, and his having satisfied one hundred and ninety-one dollars of the judgment of Robbins.
.If Joseph Faris paid for the slaves to Fulcher, and the legal title was vested in John, to protect the property from the creditors of Joseph, then John holds, as trustee for the creditors, and they can enforce their claims by bill: 3 Yerg. 81. This raises the question: Did Joseph Faris purchase the slaves from Fulcher, *160 and pay the purchase money? and this depends on the proof, which is contradictory.
The bill expressly alleges, that Joseph did make the purchase: the answer directly denies the fact, and avers John purchased and paid the purchase money for himself. The denial in the answer, requires two witnesses, or one and concurring circumstances, to disprove it. James Fulcher, the vendor, proves that John Faris purchased the negroes for himself, paid the price,part cash in hand, part in property, and gave his note due at a future day for the balance, which he paid when due. James F. Green, who wrote the bill of sale, and is the witness to it, proves the same. Mrs. Faris, the widow of Joseph, proves her husband was in insolvent circumstances; that her father purchased the negroes for himself, and paid for them, but to loan to her, which he did; but he only loaned them; that her husband never paid any thing for them that she knows of, but always said he intended to pay her father for them, as soon as he got able. All the defendant’s witnesses agree the ne-groes were purchased to loan to Joseph Faris, to aid his family, his three children being young, and the eldest idiotic, and needing a nurse.
Mary Lewis, James Robinson, Thomas Emmerson, and James M’Kerley, testify to facts, and to expressions of John Faris, going to show Joseph had purchased and paid for the negroes: though Emmerson, the strongest witness, says John said Joseph must pay him for the negroes. Mrs. Lewis’ evidence is too directly contradicted by Fulcher and Green to be entitled to any credit. Further, it is hardly possible that men of sense, such as Green and John Faris are proved to be, should plan a fraud in presence of a woman, not of the family, and accidentally about f the house, and obviously a bad keeper of secrets. The weight of evidence is decidedly ip. support of the answer, aside from a controlling circumstance: Joseph Faris, in 1824, made twenty-five *161 thousand pounds of seed cotton. He had no help save hirelings, and was encumbered with a helpless family, and had to pay the hirelings out of the crop. He had his cotton ginned, and sold to his merchant, Mark Hutchins, that part of his crop for which he got money. It amounted to two hundred and twenty-eight dollars. He had received this in small sums, (the largest forty-five dollars,) principally in the fall before the 25th December, 1824, when the negroes were purchased. This did not pay his debts; for he was sold out by the constable early in 1825. He had no money tO( pay Fulcher for the slaves.
The complainant not being entitled to any relief on the merits, it is useless to inquire whether the sheriff can come in on the foot of substitution, when he pays a part of the execution creditor’s debt. The question is new and difficult, and no opinion can be formed on it.
Peck and Greek concurred.
White, J.
This record and the evidence spread out upon the bill of exceptions, show to this court, that the matter in controversy between these parties in the suit at law, in which the present complainant, Thomas Gray, was defendant, and the present defendant, John Farris, was plaintiff, was fairly, fully, and carefully examined. The parties seem to have taken great pains in adducing and laying every thing in their power before the jury tending to elucidate the case, inform the understanding, and assist their judgment in coming to a correct conclusion on the submitted matter. Not less than thirty witnesses were examined, and perhaps a still greater number.
The great question on the trial was, whether the ne-groes, Palmer, Lavinia and Pleasant, levied on by Gray, in his character of sheriff, were at the time of the levy, the property of Joseph Farris, or the property of John Farris; the jury decided that they were the property of *162 John Parris, by finding the defendant, the sheriff, guil • ty of a conversion of them, and assessing damages to four hundred dollars; upon which verdict the circuit court rendered judgment, and upon an appeal in error being taken to the supreme court, the judgment of the circuit was affirmed.
After this affirmance in the supreme court, Gray brought his bill in equity in the court of chancery, which was answered by John Farris, defendant thereto, and the cause being brought to a hearing before the Chancellor, he dismissed the bill. It is now before us on appeal for revision of the Chancellor’s judgment, upon a re-examination of the whole matter of law and fact, pursuant to the direction of the act of assembly of 1819, ch. 31.
First, then, what is the law arising upon all these facts and proceedings which were before the Chancellor for the grounds of his decision, and are now before us upon this appeal, and which it is unnecessary to recapitulate or restate?
Lord Coke, in the preface to his 8th Reports, says, “in personal actions concerning debts, goods and chattels, a recovery or bar in one action is a bar in another, and there is an end of the controversy.” Were any support necessary to the high authority of Lord Coke, it will be found in the elaborate judgment of the court of King’s Bench, delivered by Lord Ellenborough in the recent case of Outram vs. Morewood, in the year 1803, where he says, “what, therefore, Lord Coke says, that in personal actions concerning debts, goods and effects, (by way of distinction from other actions) a recovery in one action is a bar to another, is not true of personal actions alone, but is equally and universally true as to all actions whatsoever, quoad their subject matter.” See 3 East’s Rep. 357.
Phillips, in the first volume of his Evidence, lays it down, that the judgment of a court of concurrent jurisdiction directly upon the point, is, as a plea, a bar, or as *163 evidence conclusive upon the same matter directly in question in another court; and it is a bar to any action of the same nature as the first. By actions of the same nature, is meant actions of a similar degree; and not merely those which have a similitude of form. All personal actions are of the same degree, therefore each is a perpetual bar. Ph. Ev. 234. Although justice requires that third persons, who had no opportunity of examining witnesses in a suit, or of making defence, should not be prejudiced by the verdict or judgment, it is, on the other hand, equally just, that the parties to the suit should be subject to a different rule. Phillips, in support of the text laid down, quotes the Duchess of Kingston’s case in the following words: “from the variety of cases (said Chief Justice De Gray, in delivering his celebrated judgment in the Dutchess of Kingston’s case) relative to judgments given in evidence in civil suits, it seems to follow as generally true, that the judgment of a court of concurrent jurisdiction, directly upon the point, is, as a plea, a bar, or as evidence conclusive between the same parties upon the same matter, directly in question, in another court.”
I am therefore of opinion, upon these authorities, that the trial, verdict and judgment of the circuit court, and the afirmante afterwards in this court, was conclusive evidence in the court of chancery to ground the Chancellors decree upon, and therefore that his decree, which we are reviewing, should be affirmed.
But Gray claims to be the substitute of Robbins, the judgment creditor, who has an equity, as he says, to come into a court of chancery, and that he, Gray, as such substitute, has the same equity that Robbins has. This supposed equity will be noticed. What are ■ the facts ? Robbins was the judgment creditor of Joseph Faris; he took out executions on his judgments against the property of Joseph Faris, and put them into the hands of Gray, as sheriff, to be satisfied. This was the introduction of *164 Gray into this case. At this lime, upon the delivery of the executions by Robbins, and the reception of them by Gray, what were the respective rights of Robbins, the creditor, and Gray the sheriff? Robbins had a legal right to be paid his executions, founded on judgments at law, and to have them satisfied out of the property of Joseph Faris. Gray’s legal rights were to obey the command of the writs, and levy them on the property of the defendant therein, Joseph Farris, and make the money by the sale of such property, and pay over the money to Robbins, the execution creditor, in satisfaction of the execution, if available to that extent, if not, as far as available. Robbins had no equitable rights; his rights were all legal; these he transferred, to the sheriff. The sheriff’s rights were all legal also, given by the law, and their limits prescribed by it, which could not be enlarged by the act of the execution creditor, or transgressed by the sheriff. Beyond these limits, the act of the sheriff was unauthorized and illegal; and his deviation therefrom, by levying the executions on the property of any other person than the defendant therein, or by any subsequent act consequent thereto, as the treating the property of John Faris, (which was levied on) as the property of Joseph Faris and the sale of it as such, and the payment of the proceeds of such sde over to Robbins, the execution creditor, would not purge the tort committed by the sheriff in his first act of seizure, and all these acts of the sheriff subsequent to the seizure, are acts which, instead of being palliatives in equity, are aggressions in continuance, progressing in wrong, and, quis credat, he now asks a credit on the ground of them against the defendant for one hundred and ninety-one dollars, by making his injunction perpetual to that amount; which one hundred and ninety-one dollars are the proceeds upon sale of defendant’s own three negroes, for which defendant has judgment at law. He is not entitled to such a partial dissolution. The injunction must be dissolved in tolo.
Decree affirmed.